478 P.2d 284

STATE of Idaho, Plaintiff-Respondent,

v.

Carl Wendell HOLM, Florence Joan Brant, aka Florence Joan Ashpole, and Florence Virginia Walker, Defendants-Appellants.

No. 10553.

Supreme Court of Idaho

Dec. 16, 1970.

Petersen, Moss & Olsen, Idaho Falls, for appellant Holm.

St. Clair, St. Clair, Hiller & Benjamin, Idaho Falls, and Phillip Hansen, Salt Lake City, Utah, for appellants Brant and Walker.

Robert M. Robson, Atty. Gen., James R. Hargis, Asst. Atty. Gen., Boise, and Seward H. French, Pros. Atty., Idaho Falls, for respondent.

DONALDSON, Justice.

This is an appeal taken by three defendants, Carl Wendell Holm, Florence Joan Brant (also known as Florence Joan Ashpole) and Florence Virginia Walker, who were found guilty of robbery [1] subsequent to a jury trial held in July, 1969. Holm was sentenced to the Idaho State Penitentiary for a period of not more than ten years and each of the women received a sentence of not more than five years. The defendants-appellants, Holm, Brant, and Walker, appealed to this Court from their judgments of conviction on the grounds that certain remarks made by the prosecuting attorney were prejudicial to their case, several of the instructions given by the trial court were incorrect, and that certain witnesses were unlawfully impeached. This Court has decided to grant the appellants (defendants) a new trial because of the totality of errors revealed by the record in this case.

The pertinent facts are as follows.

On the afternoon of January 29, 1969, James Mason, the purported victim of the alleged robbery, underwent oral surgery. Upon leaving the dentist's office, he had several drinks at various bars in the city of Idaho Falls. At one of these establishments, the Samoa Club, Mason met the two female defendants-appellants, Brant and Walker, who were both known to him. While at the Samoa Club, Mason discussed "gambling" with Carl Wendell Holm (the third defendant-appellant).[2] Mason had a reputation for carrying large bills and Mason testified that Joan Brant asked him to show her companion, Florence Walker, a $500 bill which he did. The two women deny this occurred and claim no knowledge of the $500 bill. The trio (Mason, accompanied by the two women) left the Samoa Club and drove to the Stockmen's Bar in Mason's car. They arrived at about 9:30 P.M. (and remained there until 11:30 or 11:45 P.M.). Upon entering the Stockmen's Bar, the trio went into the back room where there were people gambling. Holm (defendant-appellant) was present in the Stockmen's Bar "back room" when Mason (the purported victim) arrived with Joan Brant and Florence Walker. Joan Brant began to gamble and lost $20. Mason cashed a $50 check with the bartender at the Stockmen's Bar and then gave $20 to Joan Brant to cover her losses. While giving the bartender the check, Mason stated that he told the bartender that he had $500 but the bartender testified that Mason

---

1. "[I.C.] 18-6501. *Robbery defined.*— Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

2. The record indicates that Mason (alleged victim) and Holm (defendant-appellant) had gambled together on previous occasions. Holm testified at trial that Mason told him at the Samoa Club that he (Mason) was going to "get even" with Holm for having cheated him.

never showed it to him nor to any one else at the Stockmen's Bar that evening.

While Mason was in the back room of the Stockmen's Bar one Farrin Martin, a business acquaintance of Mason, asked Mason to accompany him to the main part of the bar and have a drink with him. After consuming several drinks with Martin, Mason and the two women left the Stockmen's Bar and proceeded to the Flamingo Bar.

Holm also left the Stockmen's Bar and, after a stop at Ann's Bar, went to the Flamingo. Holm was present at the Flamingo when the trio (Mason, accompanied by the two women) arrived. While at the Flamingo, Mason became ill, went to the restroom, and vomited. Florence Walker accompanied Mason to the men's restroom since he was sick. Carl Holm and Joan Brant were both at the bar during this period of time. Carl Holm, informed by Joan Brant of Mason's difficulty, brought a cold glass of water to him in the restroom. The trio (Mason, accompanied by the two women) left the Flamingo Bar. Carl Holm left the Flamingo Bar shortly thereafter.

Although a perusal of the record indicates conflicting testimony throughout the trial, at this point (departure of Mason, the two women, and Holm from the Flamingo Bar) the relevant testimony of each party will be revealed since the several stories are strikingly incompatible. Mason, the purported victim, maintained that he and the two women drove downtown in his automobile to the Skyway Bar. Upon the trio's arrival at the Skyway and while the three were still in Mason's automobile, Mason claimed that Holm suddenly appeared

and ripped Mason's wallet from his pocket assisted by Brant. Holm and the two women then disappeared from the scene. The defendant-appellant, Carl Holm, relates a very different set of facts, viz., that he left the Flamingo Bar and was picked up in an automobile and driven to a friend's home where he remained until 2:00 A.M. that morning. Holm's alibi is corroborated by three witnesses. During the trial remarks were made by the prosecuting attorney regarding the past conduct and occupations of the two female defendants-appellants. Reference was also made to the fact that one of the witnesses corroborating Holm's alibi visited in the home of a former convicted felon.

As heretofore stated, Holm, Brant and Walker were convicted of robbery subsequent to a jury trial and they have appealed to the Supreme Court from the adverse judgment and also from the order of the district court denying their motion for a new trial. Numerous errors are urged in support of this appeal.

The three appellants claim that during the trial many prejudicial remarks were made by the prosecution, several instructions given by the trial court were erroneous, and that certain witnesses were unlawfully impeached by the prosecutor.

### Allegedly Prejudicial Remarks Made by the Prosecution

■ The remarks complained of [3] indicate that the prosecutor expressed his personal beliefs to the jury with respect to the guilt of the appellants-defendants. Appellants maintain that such intimation by the prosecutor was prejudicial error especially since the evidence was conflicting.[4] While

---

3. Illustrative of the comments complained of are the following:
 "I am not here to prosecute the innocent, just the guilty ones."
 "* * * none of the alibi witnesses, nor the defendants' attorney came to me or to the police to tell us of these alibis * * *. Had they come to me six months ago when this happened I would have seriously considered any credible alibi evidence with a view toward dismissal, but

because they have not done so, in my estimation, this seriously affects the credibility of these alibi witnesses and leads to the conclusion that the alibi is a fabrication put together for this trial and that these defendants are guilty."

4. See People v. Hidalgo, 78 Cal.App.2d 926, 179 P.2d 102 (1947); People v. Podwys, 6 Cal.App.2d 71, 44 P.2d 377 (1935).

this Court does not deem these remarks made by the prosecutor inherently prejudicial, nonetheless when they are considered in conjunction with the many other prejudicial comments made by the prosecutor and the numerous errors occurring throughout the course of trial, they are factors which have been considered in arriving at the Court's determination to reverse and grant the appellants a new trial. See State v. Rodriguez, 93 Idaho 286, 460 P.2d 711 (1969).

■ Appellants maintain that the purity of the jury's verdict was affected by statements and testimony elicited by the prosecuting attorney while examining Brant and Walker. Specifically objected to are some 44 references to the fact that the two were former prostitutes. It is the appellants' position that this information was completely irrelevant to the issue presented for the jury's consideration and thus served only to prejudice it and unfairly and unlawfully influence it. Where defendants are on trial for the felony of robbery, *undue* emphasis placed on the past occupations of two of the defendants may have adversely influenced the jury. Representative of the remarks which the Court deems objectionable are the following which have been excerpted from the cross examination of the defendant Brant.

"Q. Okay, Now here's an ex-prostitute with a man who's sick and drunk, and if she knows he carries lots of money—just what did you do, Miss Ashpole?

A. Mr. French, I'm a prostitute, but I'm not a thief."

"Q. Now in your professional opinion as a former prostitute would you consider this man an easy mark or not?

A. No, I wouldn't."

"Q. Do you know that Mr. Martin's on the School Board of District Ninety-one?

A. I don't know Mr. Martin. I don't know him. I met him last night.

Q. Would he have any reason to put his hands on a common prostitute?

A. He didn't know me.

MR. BENJAMIN: Objection.

A. He didn't know me. He didn't know me from Adam, because I didn't know him either.

Q. (By Mr. French) What I'm asking—the question I asked you is, would Mr. Martin, a member of the School Board, have occasion or ever want to put his hands on a common—

MR. BENJAMIN: Your Honor, I'll have to object to this—."

The Court does not think that this alone nor any one of the other numerous points standing alone raised by the appellants in this case is sufficient to require reversal. However the cumulative effect of all of these errors requires the granting of a new trial. State v. Rodriguez, *supra.* This is especially so where the prosecution's case is based principally on circumstantial evidence. The only direct evidence in the case was the testimony of the complaining witness Mason. A reading of the record in the instant case does not indicate isolated prejudicial comments made unwittingly by the prosecution but rather repeated conduct which, in this Court's opinion, requires not only rebuke, but reversal.

### Errors Relating to the Instructions

■ Appellants (defendants) maintain that it was error for the trial court to have given Instruction No. 7[5] since it denied

5. Instruction No. 7 given by the trial court:
 "You are instructed, as a matter of law, that the doubt which a juror is allowed to retain in his own mind, and under the influence of which he should frame a verdict of not guilty, must always be a reasonable doubt. A doubt produced by undue sensibility in the mind of a juror, in

view of the consequences of the verdict, is not a reasonable doubt, and the juror is not allowed to create sources or materials of doubt by remote conjectures as to possible status of the case different from those established by evidence. You are not at liberty to disbelieve as jurors if from the evidence you believe as men. Your oath imposes upon you no obliga-

them constitutional due process, equal protection of the laws, and deprived them of a fair jury trial since the instruction as given, failed to define "reasonable doubt." Although the Court, in view of its decision to reverse, deems it unnecessary to discuss the constitutional objections raised by the appellants, it is our opinion that a short discussion of whether or not the term "reasonable doubt" requires definition is appropriate. Idaho has had no requirement that the term "reasonable doubt" be defined when used in criminal instructions. Certain authorities[6] have stated that the term is self-explanatory but that proposition is unsound, the instant case being but one example of many where the expression "reasonable doubt" has been the subject of controversy. It is our opinion that when such term is used in an instruction, where the jurors are required to understand its meaning and apply it, the term should be defined more precisely so that there is no question in the jurors' minds with respect

to the concept of "reasonable doubt." By doing this the jury's deliberations will be facilitated, thus increasing the probability of reaching a correct result. The California jury instruction noted below[7] is clearer and more concise than the instruction which was given by the district court. Hereafter whenever the concept of reasonable doubt is at issue, i. e., in all criminal cases, the defendant is entitled to such instruction.

Appellants next contend that it was error for the trial court not to have instructed the jury with respect to the defense of alibi.[8] It is the position of the appellants that once sufficient evidence has been presented to raise the issue of alibi, and defense counsel specifically requests that the trial court charge the jury on that issue, the failure of the trial court to do so, constitutes prejudicial and reversible error. The trial court, however, did give an instruction which, in fact, placed the issue of alibi before the jury.[9] As long as

---

tion to doubt when no doubt would exist if no oath had been administered; and in considering the case the jury are not to go beyond the evidence to hunt up doubts, nor must they entertain such doubts as are merely chimerical or conjectural. A doubt, to justify an acquittal, must be reasonable, and it must arise from a candid and impartial investigation of all the evidence in the case.

If, after considering all the evidence, you can say that you have an abiding conviction of the truth of the charge, you are satisfied beyond a reasonable doubt."

6. Boutwell v. State, 165 Miss. 16, 143 So. 479 (1932); State v. Ransom et al., 340 Mo. 165, 100 S.W.2d 294 (1936).

7. The California Criminal Jury Instructions (Caljic 3d ed.) define the term in the following instruction:

"Caljic 2.90

"Presumption of Innocence—Reasonable Doubt—Burden of Proof

"A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is

defined as follows: It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

8. Defendants' (Appellants') requested instruction regarding alibi:

"Where defendant succeeds, by competent evidence, in establishing a reasonable doubt concerning his presence at the time and place of the offense, when such presence was essential to the commission of the offense, defendant is entitled to acquittal, but the character and extent of the evidence requisite to create such doubt is for the jury."

9. Instruction No. 15 given by the trial court:

"The Defendants in this case have offered evidence to show that they were in another place at the time of the act charged as alleged to have been committed. This is what is known in law as an alibi, that is, that the Defendants. were at another place at the time of the alleged commission of the offense charged.

the jury was instructed as to this theory of the case complaint cannot be heard merely because appellants (defendants) preferred that the instruction be phrased in a particular way. The essense of the concept of alibi and its relationship to the case were made known to the jury and thus appellants' contention is without merit.

 Appellants next assert that the trial court erred by failing to give an instruction [10] relating to the intoxication of Mason (the alleged victim of the robbery) at the time of the robbery. It is their position that since Mason's testimony sharply conflicted with the testimony of the defendants (appellants), Mason's intoxication was extremely relevant to his ability to perceive and observe the events occurring that evening.[11] The Court is of the opinion that the defendants were prejudiced since the trial court did not, when giving the instruction regarding the credibility of witnesses, include for the jury's consideration the ability of the witnesses to observe and perceive. A witness's ability to perceive bears a direct relationship to the accuracy and truthfulness of his testimony. Any sensory defects or other factors which are related to the ability of the witness to perceive are questions of fact which are for the exclusive determination of the jury.[12] Thus, the trial court upon timely request, is required to give a general instruction relating to the witnesses' ability to perceive [13] and it is within the discretion

---

You are instructed that such a defense is as proper and legitimate as any other, and all the evidence based upon the point should be carefully considered by you in determining the guilt or innocence of the respective Defendants."

10. Defendants' Requested Instruction regarding intoxication:
 "As members of the jury you are entitled to consider, and should consider, a witness' ability or lack of ability to observe, understand, remember, and relate what took place, and if a witness was intoxicated at the time of the events concerning which he testifies, you should consider what bearing this would have on his capacity for observation and correct memory."

11. The record does reveal that the jury was instructed (Instruction No. 22) that:
 "You are the exclusive judges of the credibility of the witnesses, and it is your duty to reconcile any conflict that may appear in the testimony, as far as may be in your power, upon the theory that each witness has sworn to tell the truth. When this cannot be done, you may consider the conduct of the witnesses upon the witness stand, the nature of the testimony given by them, to what extent, if any, they are corroborated or contradicted by other testimony, their interest, if any, in the case, the relation to the parties and such other facts appearing in the evidence as will in your judgment, aid you in determining whom you will or will not believe, and you may also, in considering whom you will or will not believe, take into account your experience and relations among men.
 If you believe that a witness, or any number of witnesses, have wilfully and knowingly testified falsely, in regard to any material matter, you may disregard such witnesses' testimony, except in so far as it is corroborated by other credible evidence or by facts or circumstances appearing in the case."

12. State v. Hall, 88 Idaho 117, 397 P.2d 261 (1964); State v. Bassett, 86 Idaho 277, 385 P.2d 246 (1963); People v. Wells, 20 Cal.2d 191, 124 P.2d 809 (1942). "In jury trials of criminal cases the jurors are the sole judges of the facts." 2 Underhill's Criminal Evidence, § 551, p. 1376 (5th ed. 1954).

13. "The jury may be instructed that they may take into consideration the intelligence of the witnesses and *their opportunities for observation* and means of knowledge as disclosed by the evidence, for the purpose of determining credibility." 88 C.J.S. Trial § 276 (emphasis supplied). The California Criminal Jury Instruction No. 220 is in this Court's opinion a proper statement of the law.
 "Caljic 2.20
 "Credibility of Witness
 "Every person who testifies under oath is a witness. You are the sole and exclusive judges of the credibility of the witnesses who have testified in this case.
 In determining the credibility of a witness you may consider any matter that has a tendency in reason to prove or dis-

of the trial court to give the jury a specific instruction relating to intoxication provided that the evidence adduced at trial warrants it. Therefore we find that the district court erred in failing to give the defendants' requested instruction on intoxication. In no case, however, should the trial court single out any particular witness and then instruct the jury with respect to his testimony.

> "Instructions as to the credibility of a witness should be general and apply equally to all of the witnesses for the state and the defendant alike." State v. Rogers, 30 Idaho 259 at 272, 163 P. 912 at 916 (1917).

By doing this the trial court refrains from expressing its opinion regarding the testimony given by certain witnesses. Cf., State v. Rogers, *supra*.

### Errors Relating to Improper Cross Examination and Impeachment of Witnesses

 At trial a certain witness whose testimony tended to establish an alibi for Holm (defendant-appellant) was discredited by the prosecution when it was brought out by the prosecutor during cross examination that (1) the witness associated with and frequented the home of a former convict, and (2) the witness perhaps imbibed an intoxicant prior to reciting his testimony. The fact that the witness associated with a former felon is irrelevant to whether or not the witness's testimony is credible. Respondent maintains that the prosecution's purpose in bringing out this fact was to "determine the plausibility of the story of the witness." [14] However, respondent has failed to demonstrate, in the opinion of this Court, just how the cross examination of the witness on the issue of association with a convicted felon was related to a determination of the truth or falsity of the alibi proposed by Holm. Furthermore, the impeachment of the witness was not conducted pursuant to the relevant statute.[15] It has long been settled law in Idaho that a witness may not be impeached by evidence of (particular wrongful) acts having no connection with the matter on trial. State v. Anthony, 6 Idaho 383, 55 P. 884 (1899); Labonte v. Davidson, 31 Idaho 644, 175 P. 588 (1918). Thus, it was improper for the prosecution to have brought out prejudicial evidence which was completely unrelated to the issue of alibi. In regard to the second error, it was conceded by the prosecuting attorney at the time of trial that the posing of his question relating to the witness's having consumed an intoxicant prior to testifying was

prove the truthfulness of his testimony, including but not limited to the following:

His demeanor while testifying and the manner in which he testifies;

The character of his testimony;

The extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies;

The extent of his opportunity to perceive any matter about which he testifies;

His character for honesty or veracity or their opposites;

The existence or nonexistence of a bias, interest, or other motive;

A statement previously made by him that is consistent with his testimony;

A statement made by him that is inconsistent with any part of his testimony;

The existence or nonexistence of any fact testified to by him;

His attitude toward the action in which he testifies or toward the giving of testimony;

His admission of untruthfulness;

His prior conviction of a felony."

14. Although the State (in its brief) does not contend that association with a former felon is misconduct, whether or not a person associates with a known convicted felon, the State maintains, does have an effect upon the plausibility of the witness's story when the factual issue involved is alibi.

15. "[I.C.] 9–1209. *Impeachment by adverse party.*—A witness may be impeached by the party against whom he was called, by contradictory evidence, or by evidence that his general reputation for truth, honesty or integrity is bad, but not by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony."

improper.[16] However, this presents an appropriate opportunity to indicate that a witness, who at the time of testifying is under the influence of alcohol, is not necessarily rendered incompetent. It is the function of the court to determine the qualifications and competency of witnesses. State v. Cosler, 39 Idaho 519, 228 P. 277 (1924). Furthermore, the question of competency is in most other jurisdictions solely for determination by the trial judge. 3 Wharton's Criminal Evidence, § 744, p. 70 (12th ed. 1965). Once, however, the court has made a determination to allow the witness to testify, the opposing attorney should be given an opportunity to cross examine the witness so as to demonstrate that the witness's memory or ability to relate facts has become impaired by reason of his intoxicated condition if such be the case. This is relevant to the weight to be given to his testimony.[17]

 Another witness whose testimony tended to substantiate Holm's alibi was also improperly impeached by the prosecuting attorney when he continuously posed questions [18] to the witness which were not only completely irrelevant to the issue of alibi, but which furthermore bore no relationship whatsoever to any character traits of the witness. The questions did not relate to the ability of the witness to perceive the events at the time they occurred, nor to the ability of the witness to recite testimony on the · stand. The posing of these questions served only to create unfair prejudice against the witness.

 Appellants maintain that they are entitled to a new trial since "new evi-

---

16. "I'll withdraw the question, Your Honor. It is improper."

17. See Wigmore on Evidence, § 933, p. 480 (3d ed. 1940). Although the early Idaho case of State v. Tilden, 27 Idaho 262, 147 P. 1056 (1915), decided that it was proper for the fact of a witness's intoxication *at the time of the events concerning which he testifies*, to be brought out on cross examination since this is an indicia of his ability to perceive, this Court is of the opinion that such reasoning is equally applicable to the case of a witness who testifies while in an intoxicated state.

18. "Q. * * * you say that you and your husband and you and Bud Holm are acquaintances?
A. Yes.
Q. Did you pal around together like you said?
A. He has visited in our home and he and Bill have went fishing on occasions.
Q. How often does Mr. Holm visit in your home when your children are present?
A. I would say there has been one or the other of the children there each time and approximately once a week.
Q. * * * are you aware of Mr. Holm's criminal background? The fact that he's served time in the penitentiary?
A. I have heard this, yes.
Q. Are you aware of it personally?
A. I have heard this. I have heard that he has been—I know he's been on trial for things like this, yes.

Q. (By Mr. French) Did you know that he served time in the penitentiary on one occasion?
A. Yes, I do.
Q. Now is your husband a former convict?
A. Yes.
Q. Do you consider it a proper home atmosphere to permit your husband's former convict friends around your children?
A. As long as someone comes into my home and can act well mannered and treat my kids decent and talk to my kids like Bud can, yes.
Q. Now * * * this might be the case, but you say that Mr. Holm has been in your house on frequent occasions intoxicated. Now do you consider this a proper home atmosphere?
A. He has never been in front of my children intoxicated.
Q. But then again he's been in your home at late and unusual hours in an intoxicated condition, hasn't he?
A. Yes, but my children go to bed early.
Q. You say he's loud mouthed—or I should say loud voiced?
A. Loud.
Q. Laughs loudly when he's intoxicated?
A. Yes, but my children's doors are shut when they go to bed.
Q. All I'll do is ask * * * if you think this is the proper situation in which to raise children? Maybe you do."

dence" (not available at the time of trial) has been discovered indicating that the $500 bill purportedly stolen from the victim never in fact existed. Mason, the robbery victim, testified that a $500 bill, series 1934A, serial number 00017680A, which he ordered from the bank, was taken from him. Subsequent to trial an affidavit was filed in support of a motion for new trial which revealed that the serial number on a $500 bill ordered from the bank at Mason's request bore the serial number L00084685A, a different number than the one appearing on the bill Mason claims was stolen from him. Furthermore, the series of the bill developed into a significant issue at trial since the defense claimed that no $500 bill bearing the series "A" was ever produced. The prosecution, however, introduced evidence tending to show that one or two $500 series "A" bills were in fact produced. The discovery of this new evidence in conjunction with the other numerous errors which the Court has heretofore discussed require the granting of a new trial.

Appellants have assigned numerous additional errors but we deem them meritless.

Judgment reversed and cause remanded for new trial.

McFADDEN, C. J., and McQUADE, SHEPARD and SPEAR, JJ., concur.